[Crim. No. 21263. Feb. 19, 1981.]

In re IRENE HOP on Habeas Corpus.

COUNSEL

Charles E. Ward, Public Defender, Littleton M. Gunn and Andrew E. Rubin, Deputy Public Defenders, for Petitioner.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, A. Wells Petersen and Jay M. Bloom, Deputy Attorneys General, for Respondent.

OPINION

RICHARDSON, J.—We are presented with a habeas corpus petition filed on behalf of Irene Hop who is a developmentally disabled adult woman presently suffering from juvenile ceroid lipofunscinosis (Spielmeyer Vogt or Batten disease). The petition, verified by her counsel of

record, recites that since 1975 she has been under the care of Inland Counties Regional Center (the Center), that she has neither guardian of her person or estate nor conservator, and that for several years she had been cared for at the Salem-Christian Home in Ontario, California but on February 15, 1979, on the petition of her mother, she was placed in respondent Lanterman State Hospital, a more confining facility, as a nonprotesting developmentally disabled person. It is further alleged that she lacked the ability to object to her transfer to respondent, and that through successive but unsuccessful petitions for habeas corpus she has been unable to obtain any judicial review of the propriety of her initial transfer and confinement at respondent hospital.

The central issue presented is whether the statutory scheme which permits the placement of "non-protesting" developmentally disabled adults in state hospitals for an indefinite time meets the constitutional requirements of due process and equal protection of the laws. We will conclude that the present statutory procedures are constitutionally infirm.

## STANDING

We dispose first of a preliminary contention by respondent hospital that the Public Defender of San Bernardino County lacks standing to bring this proceeding on behalf of Hop because neither she nor her family objected to her initial hospital placement or continued confinement. Indeed, it was her mother who requested her placement with respondent hospital.

Penal Code section 1474 contemplates that an application for a writ of habeas corpus may be signed "either by the party for whose relief it is intended or by some person in his behalf." In similar fashion, Welfare and Institutions Code section 4800 (all further statutory references will be to this code unless otherwise indicated) specifies that a request for release of an adult admitted or committed to a state hospital may be made either by the adult or "any person acting on his behalf," and that thereafter the "developmentally disabled patient shall have a right to a hearing by writ of habeas corpus." Thus, under the general authority in the Penal Code and the specific statutory provisions dealing with the developmentally disabled, proceedings may be initiated by a "person" on "his behalf," and habeas corpus is designated as the appropriate means for challenging confinement in a state hospital.

In *In re Harrell* (1970) 2 Cal.3d 675 [87 Cal.Rptr. 504, 470 P.2d 640], we expressed our views concerning requests by prisoners to file habeas corpus petitions for other prisoners. Referring to the habeas petition, we said that "although it may be prepared by another, [the application] should be signed, verified, and filed by the inmate or inmates seeking relief" (p. 689), and that "Only in *very exceptional circumstances* will a 'next friend' application [citation] be entertained. '[T]he complaint must set forth some reason or explanation ... showing why the detained person does not sign .... It was not intended that the writ of habeas corpus should be availed of, as a matter of course, by intruders or uninvited meddlers, styling themselves next friends. *Gusman* v. *Marrero* [1901] 180 U.S. 81 ....'" (*Ibid.*, fn. omitted, italics added.)

The petition before us recites Hop's lack of "ability to protest her transfer to a more restrictive placement." Her placement was initiated by her mother with the concurrence of the regional center and hospital staff. We would not reasonably anticipate that those initiating, recommending and concurring in her placement would challenge, by habeas corpus proceeding, the propriety of their own actions. Furthermore, we cannot assume that Hop who has been placed in the hospital because of her disability would be competent to initiate or to "sign, verify and file" a habeas corpus petition. (Cf., *In re Davis* (1973) 8 Cal.3d, 798, 806-807, fn. 6 [106 Cal.Rptr. 178, 505 P.2d 1018].) We conclude, accordingly, that the "exceptional circumstances" exist which were required in *Harrell* (see 2 Cal.3d at p. 689, fn. 8), and that the public defender has standing under Penal Code section 1474 and Welfare and Institutions Code section 4800 to bring this habeas corpus petition.

## THE STATUTORY COMMITMENT AND RELEASE PROCEDURES

Hop was placed in a state hospital under the provisions of Welfare and Institutions Code section 4825 which authorizes "the admission of an adult developmentally disabled person to a state hospital ... upon the application of the person's parent or guardian or conservator in accordance with the provisions of Sections 4653 and 4803." Sections 4653 and 4803 permit placement in a state hospital if the regional center recommends such placement and "an employee or designee" of the regional center certifies that no objection has been made to the placement by either the person recommended or any person acting on his behalf. Section 6000.5 authorizes the state hospital to accept a person so recommended.

Respondent contends that Hop's placement was "voluntary," stressing that any person acting on her behalf and objecting to her placement could obtain her freedom pursuant to habeas corpus release authorized by section 4800 et seq. or pursuant to the administrative process described in the Release Procedures Manual used by the state hospitals for the developmentally disabled. We examine and summarize these suggested procedures.

Section 4800 et seq. provides that every person (who, for convenience, we hereafter describe as the ward) admitted or committed to a state hospital or other related facility "shall have a right to a hearing by writ of habeas corpus for his release . . . after he or any person acting on his behalf makes a request for release to any member of the staff . . . ." Judicial review occurs in the appropriate superior court which may either order the ward's release, or conduct an evidentiary hearing following which, if the court finds that the ward is not developmentally disabled or is disabled but "able to provide safely for his basic personal needs for food, shelter, and clothing, he shall be immediately released." If the ward needs care and there is a responsible person, regional center, or other agency willing and able to assume such care the court may release the ward to such responsible person or agency. If the ward is found to be developmentally disabled and without parent, and lacking but needing a conservator the court "shall order the appropriate regional center or the state department to initiate . . . proceedings for the appointment of a conservator . . . ." (§ 4801.)

The Release Procedures Manual provides the necessary steps to be taken when a voluntary or nonprotesting developmentally disabled resident, verbally or nonverbally, indicates that he or she wishes to leave the facility. Within 24 hours a "validity conference" must be held at which the staff evaluates the request. If staff concludes that harm may result from immediate release, the regional center must be notified and asked to determine within five days whether commitment procedures pursuant to section 6500 or community placement should be initiated. If a petition for commitment is filed at the regional center's request, the ward's status is changed to that of a "detainee" under section 6506 which authorizes detention in a state hospital pending a commitment hearing. If no commitment petition is filed and a community placement is not immediately available the ward is placed on "administrative hold," and detained in the hospital while a formal request for release is forwarded to the superior court.

We test these procedures applying well accepted constitutional standards.

CONSTITUTIONAL ANALYSIS

■ Section 4502 provides that "Persons with developmental disabilities have the same legal rights and responsibilities guaranteed all other individuals by the Federal Constitution and laws and the Constitution and laws of the State of California." This is but a legislative reaffirmation of a firmly rooted and independent constitutional principle which assures that persons will not be deprived of due process or equal protection of law on the basis of developmental disability alone.

■ We have consistently recognized several related and controlling principles. "[P]ersonal liberty is a fundamental interest, second only to life itself . . . ." (*People v. Olivas* (1976) 17 Cal.3d 236, 251 [131 Cal.Rptr. 55, 551 P.2d 375].) An involuntary civil commitment in a state hospital for the mentally ill is a commitment which requires the application of criminal due process standards. (*Conservatorship of Roulet* (1979) 23 Cal.3d 219, 224-225 [152 Cal.Rptr. 425, 590 P.2d 1].) Any confinement in a state hospital for the developmentally disabled must invoke the same standard. We have also insisted that "although the procedures leading to the commitment of various classes of people for treatment or to protect society from them need not be identical in all respects, none may deny to one such class fundamental rights or privileges accorded to another unless a rational basis for the distinction exists." (*In re Gary W.* (1971) 5 Cal.3d 296, 304 [96 Cal.Rptr. 1, 486 P.2d 1201].) ■ Finally, in reviewing statutorily created classification schemes which affect fundamental interests the burden rests upon the state to establish that "it has a 'compelling interest' which justifies the challenged procedure and that the distinctions drawn by the procedure are necessary to further that interest." (*In re Moye* (1978) 22 Cal.3d 457, 465 [149 Cal.Rptr. 491, 584 P.2d 1097]; *People v. Olivas, supra*, 17 Cal.3d at p. 251.)

Mindful of the foregoing principles, we examine with a critical eye that feature of the statutory scheme which permits admission of the developmentally disabled to state hospitals without judicial hearing when no objection has been made by the ward.

## THE NATURE OF THE PLACEMENT

■   Respondent argues that we need not examine the constitutionality of section 4825 placements because persons placed under the section are admittees, not committees, who are free either to leave or to object to their confinement. Respondent stresses the fact that admission of the ward is conditioned upon a lack of any objection and that requests for release by a parent, guardian, or conservator or by the ward herself will be honored (§ 4800 and the Release Procedures Manual). It is argued that "there is really no need for any hearing. Persons who are in any way capable of objecting may do so . . . . Persons who are so low functioning that they cannot in any way object could not assist in any hearing on their behalf anyway."

Consideration of these contentions both highlights the problem and points to the answer. The statutory scheme contemplates that wards who are competent to make a decision requesting admission to a state hospital may do so under section 6000, subdivision (a). Those who are not competent to make such a request may be placed in a state hospital without judicial review *unless* they object. Once placed in the hospital at the request of another they may not be released unless the release is requested by parent, guardian, or conservator, or approved following a staff evaluation to determine the validity of the patient request and the propriety of a release.

Respondent's argument contains an inherent analytical difficulty. Hop is presumed sufficiently *competent* to understand the need for her to object to her placement when it has been initiated by a third party, her mother. At the same time she is presumed *incompetent* to a degree which would prevent her from requesting admission or, once confined, obtaining unilaterally and without review her own release. In short, although they are incompetent on their own to get in or out, nonprotesting developmentally disabled adults are statutorily presumed competent enough to be able to object to hospital placement initiated by others. The ward's dilemma is akin to that faced by the admittee described in a recent article, "If you try to leave, they go to court to make you stay; if you do not try to leave, you demonstrate that you want to stay." (Ferleger et al., *Anti-Institutionalization: The Promise of the Pennhurst Case* (1979) 31 Stan.L.Rev. 717, 737.)

It is difficult to accept the thesis that a lack of objection may be construed as an affirmative request for placement by those who otherwise

are deemed incompetent to request hospital admission. Nor can a lack of objection before or after admission be construed as a waiver of constitutional rights to which a ward may otherwise be entitled. The failure to object to a commitment by a third party who is neither conservator nor legal representative is no waiver.

A valid waiver must be both knowing and intelligent. In reviewing the constitutionality of the Lanterman-Petris-Short Act, as it affected the involuntary detention of mentally disordered patients, we have held that "Absent an understanding by the patient of the nature of his detention and of his rights, it is difficult to perceive how he could knowingly decide whether or not to exercise them." (*Thorn* v. *Superior Court* (1970) 1 Cal.3d 666, 675 [83 Cal.Rptr. 600, 464 P.2d 56].) In similar fashion and within a related context, we observed more recently, "A minor may, of course, waive any of these rights and acquiesce in the parent's decision to place him in a state hospital for treatment, thus achieving what is in practical effect a 'voluntary' admission. *To be truly voluntary and intelligent in a constitutional sense such a waiver should be made only if the minor is aware of his rights and the consequences of the waiver,* including the nature of the commitment, its probable duration, and the treatment regimen." (*In re Roger S.* (1977) 19 Cal.3d 921, 938, fn. 10 [141 Cal.Rptr. 298, 569 P.2d 1286], italics added.)

The constitutional requirement of a knowing and intelligent waiver is not met by establishing the availability of, or the ward's failure to demand, a postplacement right to a hearing or staff review. In *In re Davis, supra,* 8 Cal.3d 798, we examined the parallel situation involving the status of those persons committed under Penal Code section 1367 as incompetent to stand trial. Referring to a habeas corpus remedy we emphasized that, "It must be kept in mind, however, that we are dealing with persons who have been committed to state hospitals for mental disorders rendering them incompetent to participate in their own defense. It seems clearly inappropriate to place upon such persons the burden of initiating proceedings to secure their freedom." (*Id.,* at pp. 806-807, fn. 6.)

Similar considerations appear applicable herein where the person's asserted developmental disability is one which, by definition, is not susceptible of either cure or remission.

At this point, a complicating companion problem is presented, namely, a role conflict arising from the fact that the agency responsible for the care and therapy of the ward is the entity which is given the added duty of notice and explanation of the ward's constitutional rights. (See *Thorn* v. *Superior Court, supra*, 1 Cal.3d at p. 675.) The regional centers and hospital staffs charged with care, treatment, and therapy, are simultaneously entrusted with notice and explanation of rights. This role conflict may be further aggravated by an additional subtle pressure favoring hospital treatment as opposed to community placement of the ward. Local community placement may be difficult to locate and also expensive, and its cost may be borne locally by a regional center's budget. Hospital placements are funded from statewide sources. The centers, charged with administering and paying for therapy and care, and also with recommending and finding suitable placement must simultaneously determine whether an objection to the proposed hospital placement has been made. (§ 4620 et seq.) A subtle strain is thereby placed on the center's impartial neutrality and detachment which unconsciously in its administrative decision may thereby favor hospital placements at state expense.

From all of the foregoing considerations we conclude that a developmentally disabled adult placed in a state hospital at the request of one not so legally authorized (see, e.g., § 5358) may not be deemed a "voluntary" admittee because he or she neither requested nor knowingly agreed to the placement. It follows that the present statutory scheme which permits indefinite placement of such nonprotesting developmentally disabled adults in a state hospital without any hearing constitutes a denial of due process of law.

EQUAL PROTECTION

■ No other class of adults similarly situated and in need of protective custody may lawfully be placed in a state hospital without a knowing and intelligent waiver of rights, or a request, or a judicial determination that placement is appropriate. (See *In re Gary W., supra*, at pp. 304-305 [comparing rights of the mentally retarded with rights of other disabled persons].) No rational basis has been suggested for denying to the incompetent developmentally disabled those procedural rights which are readily granted to other incompetent adults for whom state hospital placement is sought.

We noted in *Gary W., supra*, that "we must evaluate the procedures adopted . . . in light of other statutory provisions governing involuntary commitment." (5 Cal.3d at p. 304.) In that case we answered a contention, similar to that raised herein, that because a jury trial was denied to mentally retarded persons in similar fashion a jury trial might also be denied Youth Authority wards. We stated that "The state does not meet its burden of demonstrating a compelling interest in denying the right to jury trial to Youth Authority wards by claiming that other distinctions exist among these procedures or by pointing out that alleged mentally retarded persons are similarly discriminated against." (*Id.*, at p. 308.)

In justifying disparate treatment of the developmentally disabled, we are unable to substitute for constitutional safeguards the admitted good intent both of the state and of those treating the developmentally disabled. Again, in *Roger S.* we stressed "our assumption that the great majority of parents are well motivated and act in what they reasonably perceive to be the best interest of their children. That fact cannot, however, detract in any way from the child's right to procedures that will protect him from arbitrary curtailment of his liberty interest in such a drastic manner no matter how well motivated." (19 Cal.3d at p. 936; see *In re Conservatorship of Roulet, supra*, 23 Cal.3d at p. 225.) Neither the benevolent intent of the Legislature, nor of those involved in the care of the developmentally disabled, nor the force of the legislative directive mandating the least restrictive placements for the developmentally disabled (see, e.g., §§ 4418.5, 4502, 6509) renders constitutional the legislative scheme which denies them the procedural safeguards of a hearing which is uniformly extended to other potential wards.

From the foregoing we conclude that the placement of Irene Hop in a state hospital at the request of her mother, in the absence of either a judicial determination regarding her disability or a knowing and intelligent request for admission was unconstitutional. She is entitled to a judicial hearing on the question of whether, because of developmental disability she is gravely disabled or a danger to herself or others and whether placement in a state hospital is warranted. We analogize her situation to that of proposed conservatees under the Lanterman-Petris-Short Act. As such she is entitled to the same congeries of rights including the right to a jury trial on demand (see *Conservatorship of Roulet, supra*, 23 Cal.3d at p. 222; *Regional Center of Orange* v. *King* (1978) 80 Cal.App.3d 860 [146 Cal.Rptr. 24] [right to jury trial on de-

mand in §§ 6513-6519 proceeding (repealed, eff. Jan. 1, 1979)]; *O'Brien* v. *Superior Court* (1976) 61 Cal.App.3d 62, 68-69 [132 Cal.Rptr. 13] [right to jury trial on demand in § 6500 proceeding]; Prob. Code, § 1827; § 5350 et seq.) and to the application of the standard of proof beyond a reasonable doubt (*Conservatorship of Hofferber* (1980) 28 Cal.3d 161, 178 [167 Cal.Rptr. 854, 616 P.2d 836] [incompetent criminal defendants entitled to jury determination and proof beyond a reasonable doubt on issue of existence of dangerous mental condition]; *Conservatorship of Roulet, supra,* 23 Cal.3d at p. 235; see also *People* v. *Burnick* (1975) 14 Cal.3d 306, 332 [121 Cal.Rptr. 488, 535 P.2d 352]; *People* v. *Feagley* (1975) 14 Cal.3d 338, 342 [114 Cal.Rptr. 663] [standard of proof beyond a reasonable doubt applies in Mentally Disordered Sex Offenders Law proceedings]; *In re Gary W., supra,* 5 Cal.3d 296, at pp. 305-307 [Youth Authority wards for whom extended commitment is sought on the basis of physical or mental disorder, deficiency, or abnormality, entitled to jury trial and procedures afforded to mentally disordered sex offenders and narcotics addicts].)

## DISPOSITION

Our holding does not require the immediate release either of Hop or of those presently held in state hospitals under the authority of section 4825. We reaffirm our cautionary observation in *Roger S., supra,* that "A precipitous release of these [adults] to families and community facilities unprepared to care for them could be both disruptive to the treatment program and potentially harmful to the [patient] and the community." (19 Cal.3d at p. 940.) Hop is, however, entitled to a prompt hearing which complies with the requirements herein described. She will also be entitled to the appointment of counsel, for, consistent with the views expressed by us in *Roger S.,* "[i]nasmuch as a minor [or a developmentally disabled adult] may be presumed to lack the ability to marshal the facts and evidence, to effectively speak for himself and to call and examine witnesses, or to discover and propose alternative treatment programs, due process also requires that counsel be provided . . . ." (*Id.,* at p. 938; *Thorn* v. *Superior Court, supra,* 1 Cal.3d at pp. 672-673; see also Prob. Code, §§ 1470-1472; §§ 4801, 6500.)

Petitioner unsuccessfully sought relief by petition to the superior court of the county in which she is confined but no hearing has been held to determine whether a basis exists for her confinement. The superior court is the appropriate forum in which to adjudicate disputed

issues of fact. No writ having issued on her last application to the superior court, petitioner is not precluded from again seeking relief by petition to that court. (Pen. Code, § 1475.)

The order to show cause is therefore discharged and the petition denied without prejudice to a renewed application for relief in the superior court. (*In re Roger S., supra*, 19 Cal.3d at pp. 940-941.)

Bird, C. J., Tobriner, J., Mosk, J., and Newman, J., concurred.

Respondent's petition for a rehearing was denied April 1, 1981.